**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL R. DEWEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:05 CV109 LMB** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Michael R. Dewey for Disability Insurance Benefits under Title II of

the Social Security Act and Supplemental Security Income benefits under Title XVI of the Act.

This case has been assigned to the undersigned United States Magistrate Judge pursuant to the

Civil Justice Reform Act and is being heard by consent of the parties.  See

28 U.S.C. § 636(c).  Plaintiff has filed a Brief in Support of Complaint.  (Document Number 16).

Defendant has filed a Brief in Support of the Answer.  (Doc. No. 18).  Plaintiff has also filed a

Reply.  (Doc. No. 21).

**Procedural History**

On January 6, 2003, plaintiff filed his applications for Disability Insurance Benefits and

Supplemental Security Income, claiming that he became unable to work due to his disabling

condition on August 18, 1999.  (Tr. 66-68, 227-30).  Plaintiff's applications were denied initially,

and following an administrative hearing, plaintiff's claims were denied in a written opinion by an Administrative Law Judge (ALJ), dated August 13, 2004.  (Tr. 55-59, 14-20).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on May 3, 2005.  (Tr. 9, 5-8).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481 (2003).

## Evidence Before the ALJ

### A.  ALJ Hearing

Plaintiff's administrative hearing was held on July 20, 2004.  (Tr. 28).  Plaintiff was present and was represented by counsel.  (Tr. 30).  Plaintiff's counsel indicated that plaintiff's alleged onset date was August 18, 1999, which corresponded to the last date plaintiff worked.  (Tr. 31).  Plaintiff's attorney stated that plaintiff was insured through December of 2004.  (Id.).  The ALJ then admitted a number of exhibits into the record.  (Id.).  Plaintiff's attorney stated that the record was complete and up-to-date.  (Tr. 32).

Plaintiff's attorney then examined plaintiff, who testified that he was 45 at the time of the hearing.  (Tr. 33).  Plaintiff stated that he is a high school graduate.  (Id.).  Plaintiff testified that he last worked in August of 1999 as a factory worker at a factory that manufactured gutters.  (Id.).  Plaintiff stated that he worked at this position for eight years.  (Id.).  Plaintiff testified that he worked for a landscaping company doing general landscaping work for three years prior to working at the factory.  (Id.).  Plaintiff testified that he has been married for thirteen years and has four children, who are two, six, eleven, and fourteen.  (Tr. 33-34).  Plaintiff stated that his wife works at Cap America, which is a hat manufacturing plant.  (Tr. 34).  Plaintiff testified that he receives Medicaid benefits.  (Id.).

Plaintiff stated that his primary problems preventing him from working are his back and neck pain, and his inability to stand or walk. (Id.). Plaintiff testified that he has undergone two lower back surgeries, and that screws were put in his back during the last surgery. (Tr. 35). Plaintiff stated that he had the surgeries because the disks in his lower back were degenerating. (Id.). Plaintiff testified that he had the first surgery in 1996, and that he was able to return to work after the surgery. (Id.). Plaintiff stated that he had the second surgery in 1997. (Id.). Plaintiff testified that he was able to return to work after that surgery, although he was unable to continue working due to the pain. (Tr. 36). Plaintiff stated that his lower back aches constantly. (Id.). Plaintiff testified that his medication provides relief from his pain on some days, although he experiences severe pain that forces him to remain in bed all day about three days a week. (Id.).

Plaintiff testified that he has also had two surgeries on his neck. (Tr. 35). Plaintiff stated that he had the first surgery in the 1980s when he broke his neck in an automobile accident. (Id.). Plaintiff testified that he had the second surgery in 1995. (Id.). Plaintiff stated that he experiences shooting pain in his neck that also causes headaches. (Tr. 37). Plaintiff testified that he experiences headaches at least once a day that last from an hour to all day. (Id.).

Plaintiff testified that Dr. Phil Beyer, his primary care physician, and Dr. Stephen D. Mellies, a neurosurgeon, both prescribe medications for him. (Id.). Plaintiff stated that his dosage of Neurontin[1] has been increased, and his prescription for Flexeril[2] has been discontinued. (Id.). Plaintiff testified that he takes other medications as prescribed by his physicians. (Tr. 38).

---

[1]Neurontin is indicated for the management of postherpetic neuralgia in adults. See Physician's Desk Reference (PDR), 2590 (59th Ed. 2005).

[2]Flexeril is indicated for relief of muscle spasm associated with acute, painful musculoskeletal conditions. See PDR at 1931.

Plaintiff stated that his medications cause him to become irritable, drowsy, and lethargic. (Id.).

Plaintiff testified that he has liver problems caused by hepatitis, for which he is not being treated. (Id.). Plaintiff stated that he has had surgery on his right hand, which is his dominant hand, because his hand "keeps trying to close up." (Tr. 39). Plaintiff testified that the most recent surgery was in early 2003, and that it did not help. (Id.). Plaintiff indicated that his hand is getting worse. (Id.).

Plaintiff testified that he lives in a house with his wife and children. (Tr. 40). Plaintiff stated that his wife works during the day. (Id.). Plaintiff testified that he does laundry, picks up, washes the dishes, and cooks. (Id.). Plaintiff stated that he experiences difficulty carrying the laundry to the laundry room and bending over to fold it. (Id.). Plaintiff testified that he does two loads of laundry on a good day, and on a bad day, he is only able to do one partial load of laundry. (Tr. 40-41). Plaintiff stated that he experiences difficulty bending over while cleaning. (Tr. 41). Plaintiff testified that he experiences difficulty standing while washing dishes, and that he can only stand about ten minutes before he has to sit down and take a break due to back pain. (Id.). Plaintiff stated that he only cooks hot dogs and microwave pizzas. (Id.). Plaintiff testified that he tries to vacuum, although he usually cannot finish due to lower back pain. (Tr. 42). Plaintiff stated that he tries to mow his yard, which is small, but he can only mow for ten to twenty minutes before he has to take a break. (Id.). Plaintiff testified that his children assist him with all of these household activities, and that they do more work than he does. (Id.).

Plaintiff testified that the only hobby he has is reading. (Id.). Plaintiff stated that he used to enjoy hunting and fishing, but he can no longer engage in these activities. (Id.). Plaintiff testified that he has not fished in five years. (Id.). Plaintiff stated that he tried to deer hunt a year prior to the hearing, but he had to stop after two hours because he could not tolerate the walking.

(Id.).

The ALJ then examined plaintiff, who testified that he recalled being examined by Dr. Thomas Sparkman. (Tr. 45). Plaintiff stated that he cannot lift 50 pounds, although he can walk one-half of a mile on flat ground. (Id.). Plaintiff testified that he used to drink occasionally. (Id.). Plaintiff stated that he used marijuana when he was younger, but he has never used cocaine or heroine. (Id.). Plaintiff testified that he waited until January of 2003 to apply for disability benefits because he attempted to return to work. (Tr. 46). Plaintiff stated that he looked for work as a laborer but could not find a job. (Id.). Plaintiff testified that he has worked as a carpenter and a landscaper, and that he has also worked in sawmills. (Id.). Plaintiff testified that he was in the Marine Corps for three years and was discharged for "bad conduct." (Id.). Plaintiff explained that he went AWOL after he finished boot camp and was discharged from the Marine Corps. (Tr. 47).

Plaintiff's attorney then examined plaintiff, who testified that he experiences difficulty sitting. (Tr. 48). Plaintiff stated that he can sit about twenty minutes before he has to move due to pain. (Id.). Plaintiff testified that his back aches when he rides in a car. (Id.). Plaintiff stated that he only rides in the car for long distances to attend doctor appointments and hearings. (Id.).

**B.    Relevant Medical Records**

Plaintiff presented to David R. Lange, M.D. on September 3, 1998. (Tr. 131-32). Plaintiff reported that he was improving with time, and that he believed his lower extremities were normal. (Tr. 131). Dr. Lange noted that physical therapy reports confirmed that plaintiff was improving. (Id.). Dr. Lange stated that plaintiff's physical examination was "quite benign," his straight leg raise exam was normal bilaterally, and he flexed "extremely well." (Id.). Dr. Lange

found that plaintiff was also neurologically normal.  (Id.).  Dr. Lange concluded that plaintiff "seems to be doing fine."  (Id.).  He also noted that plaintiff was still smoking.  (Id.).  Dr. Lange indicated that a return to work date would be set at plaintiff's next visit.  (Tr. 132).

Plaintiff saw Dr. Lange on September 24, 1998, at which time plaintiff reported that his rehabilitation was working, although he still experienced difficulty with maximal lifting and prolonged standing on hard surfaces.  (Tr. 129).  Dr. Lange stated that plaintiff was "making significant gains," and was lifting up to 88 pounds.  (Id.).  Dr. Lange noted that plaintiff's former job required him to lift more than 88 pounds.  (Id.).  Dr. Lange recommended that plaintiff continue with work hardening.  (Id.).  Dr. Lange indicated that plaintiff should be released for work in three weeks.  (Tr. 130).

Plaintiff saw Dr. Lange on October 15, 1998, at which time Dr. Lange indicated that plaintiff was making gains with regard to his repetitive lifting and maximal lifts.  (Tr. 128).  Dr. Lange noted that plaintiff's job required lifting over one hundred pounds on a frequent basis. (Id.).  Dr. Lange stated that x-rays revealed progressive obliteration of the joint surfaces.  (Id.). Dr. Lange concluded that plaintiff continued to progress both radiographically and in rehabilitation.  (Id.).  He recommended that plaintiff continue with work hardening for three weeks.  (Id.).  Dr. Lange indicated that plaintiff could return to full-duty on November 9, 1998. (Id.).

On November 24, 1998, plaintiff reported that he tolerated working until eight days prior to his visit.  (Tr. 126).  Plaintiff indicated that he developed significant back pain and has not worked since that time.  (Id.).  Dr. Lange stated that plaintiff's gait was rapid without obvious discomfort, plaintiff got up and down without difficulty, and plaintiff seemed pleasant and in no

distress.  (Id.).  Dr. Lange concluded that plaintiff would do reasonably well long-term.  (Id.).  He recommended that plaintiff continue to try as far as engaging in activities and working.  (Id.).  Dr. Lange prescribed Darvocet[3] for plaintiff to use as needed, and noted that plaintiff should be able to drive and work without impairment.  (Id.).

On December 15, 1998, plaintiff reported that he was working at his usual full duty job, although he experienced some intermittent discomfort.  (Tr. 124).  Plaintiff indicated that he experienced much less discomfort than he did prior to his fusion.  (Id.).  Upon physical examination, Dr. Lange found that plaintiff ambulated in a normal fashion, exhibited normal toe walking and heel walking, extended without complaint, flexed to 75 degrees, and straight leg raised at 75 degrees.  (Id.).  Dr. Lange concluded that plaintiff had reached maximum medical improvement and could continue with his full-duty job.  (Tr. 125).

Plaintiff presented to Dr. Lange on June 29, 1999, at which time he reported that he was struck on the back of the neck by ten foot long boxes while at work on June 23, 1999.  (Tr. 122).  Dr. Lange noted that plaintiff was evaluated at the emergency room, where he was prescribed Percocet[4] and told to stay off work for two days.  (Id.).  Dr. Lange indicated that plaintiff was working again.  (Id.).  Dr. Lange stated that x-rays revealed an anterior cervical fusion at C4-5[5]

---

[3]Darvocet is indicated for the relief of mild to moderate pain.  See PDR at 402.

[4]Percocet is indicated for the relief of moderate to moderately severe pain.  See PDR at 1223.

[5]Abbreviation for cervical vertebra (C1-C7).  Stedman's Medical Dictionary, 265 (27th Ed. 2000).  The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical

and C5-6, and degeneration at C6-7.  (Tr. 123).  Dr. Lange concluded that plaintiff appeared to

have an intermittent left C7 radiculopathy.[6]  (Id.).  He stated that plaintiff had no definite motor

weakness.  (Id.).  Dr. Lange prescribed low-dose tapering steroids, and recommended that

plaintiff be cautious with extreme movements of the neck.  (Id.).  Dr. Lange released plaintiff to

full-duty work.  (Id.).

On July 15, 1999, plaintiff reported that he was worse and that he had missed a lot of

work due to neck pain that radiated to his left arm.  (Tr. 121).  He also complained of numbness

in his hand extending from his long finger to his thumb.  (Id.).  Dr. Lange assessed that plaintiff

appeared to have a left C7 radiculopathy.  (Id.).  He noted that plaintiff appeared to be

experiencing significant discomfort.  (Id.).  Dr. Lange recommended that plaintiff stay off work

until MRI results could be obtained.  (Id.).

Plaintiff underwent an MRI of the cervical spine on July 23, 1999.  (Tr. 119-20).  Plaintiff

saw Dr. Lange on August 5, 1999, to discuss the MRI.  (Tr. 118).  Dr. Lange stated that

plaintiff's symptoms continue and plaintiff indicated that they were getting worse.  (Id.).  Dr.

Lange stated that the MRI revealed that the C6-7 level is degenerative, but no new herniations

were seen.  (Id.).  Dr. Lange noted that plaintiff's symptoms were rather discrete and were in the

left C7 nerve root distribution, and that he should have pathology at C6-7.  (Id.).  Dr. Lange

stated that plaintiff should either live with his symptoms and return to work or undergo further

testing.  (Id.).  Dr. Lange indicated that plaintiff would undergo electrodiagnostics to determine

whether left C7 radiculopathy was present.  (Id.).

_____

Information Systems for Lawyers, § 6:27 (1993).

[6]Disorder of the spinal nerve roots.  Stedman's at 1503.

Plaintiff underwent an electromyography[7] on August 13, 1999, which was normal. (Tr. 117). No evidence of C7 radiculopathy was found. (Id.).

Plaintiff saw Dr. Lange on August 17, 1999, to discuss the results of the electrodiagnostics. (Tr. 116). Dr. Lange stated that the studies were normal. (Id.). Dr. Lange indicated that surgery was not warranted. (Id.). Dr. Lange stated that because plaintiff's presentation was one primarily of discomfort as opposed to functional deficit, the best approach would be to give him time and progress his activities. (Id.). Dr. Lange indicated that plaintiff would return to work at full-duty the next day. (Id.).

In a letter dated September 30, 1999, Dr. Lange stated that plaintiff did not have a surgical neck lesion, despite having symptoms consistent with a left C7 radiculopathy. (Id.). Dr. Lange estimated that plaintiff had a five percent permanent partial impairment. (Id.).

Plaintiff underwent x-rays of his chest on July 10, 2001. (Tr. 165). The impression of the reviewing physician was no acute pulmonary disease, mild hyperinflation, and post-surgical changes of the cervical spine. (Id.).

Plaintiff saw Dr. Phil Beyer at Community Health Care eight times between May 30, 2002, and February 2003, with various complaints, including chest cold, skin rash, lower back pain, and hepatitis C.[8] (Tr. 147-62). On June 20, 2002, plaintiff reported that he drank about three beers a day, although Dr. Beyer indicated that plaintiff was likely under-reporting his alcohol

---

[7]The recording of electrical activity generated in muscle for diagnostic purposes. Stedman's at 576.

[8]Viral hepatitis type C is caused by an RNA virus. About 75 percent of infections give rise to chronic persistent infection. A high percentage of these develop chronic liver disease leading to cirrhosis. See Stedman's at 810.

consumption. (Tr. 158). Dr. Beyer advised plaintiff to decrease his alcohol consumption. (Id.).

On January 6, 2003, Dr. Beyer stated that plaintiff had a lumbar neuropathy[9] with a burning

sensation in his back. (Tr. 149). A history of hepatitis C was also noted. (Id.). Dr. Beyer

prescribed Neurontin and Oxycontin.[10] (Id.). On February 4, 2003, Dr. Beyer stated that plaintiff

had pain in his back with degenerative lumbar disc disease. (Tr. 147). It was noted that plaintiff

had stopped drinking alcohol except for drinking one drink the day of his appointment. (Id.). Dr.

Beyer indicated that plaintiff's dosage of Oxycontin would gradually be decreased. (Id.).

On July 25, 2002, laboratory testing was positive for hepatitis C. (Tr. 153).

Plaintiff underwent an upper endoscopy[11] on August 18, 2002. (Tr. 150-51). The

impression of the reviewing physician was Grade II Reflux Esophagitis,[12] and mild

gastroduodenitis.[13] (Tr. 151). It was recommended that plaintiff stop tobacco abuse, alcohol

abuse, and marijuana abuse. (Id.).

Plaintiff underwent an ultrasound of the abdomen on August 19, 2002, due to complaints

of right upper quadrant pain and upset stomach. (Tr. 136). The impression of the reviewing

--------

[9]A classical term for any disorder affecting any segment of the nervous system. Stedman's at 1211.

[10]Oxycontin is a controlled-release oral formulation of oxycodone hydrochloride indicated for the management of moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time. See PDR at 2819.

[11]Examination of the interior of a canal or hollow viscus by means of a special instrument, such as an endoscope. Stedman's at 594.

[12]Inflammation of the lower esophagus from regurgitation of acid gastric contents, usually due to malfunction of the lower esophageal sphincter; symptoms include substernal pain, heartburn, and regurgitation of acid juice. Stedman's at 619.

[13]Inflammation of both stomach and duodenum. Stedman's at 732.

physician was incidental right hepatic cyst,[14] otherwise normal ultrasound.  (Id.).

Plaintiff saw Gregory A. Tobin, M.D. on January 30, 2003, for evaluation regarding his hand.  (Tr. 145).  Dr. Tobin's assessment was Dupuytren's fibrosis[15] recurrence to ring and middle fingers.  (Id.).  Dr. Tobin recommended a repeat partial palmer fasciectomy[16] and possible full thickness skin grafting.  (Id.).  Plaintiff indicated that he would like to proceed with the surgery.  (Id.).

Plaintiff saw Thomas C. Sparkman, M.D. for an examination in connection with his disability claim on April 1, 2003.  (Tr. 169-74).  Dr. Sparkman noted that plaintiff was a passenger for a 55-mile drive to the office for his examination and that plaintiff demonstrated no ill effect from travel.  (Tr. 169).  Dr. Sparkman stated that plaintiff ambulated rapidly to the examining rooms without any obvious defect to his gait or station, got up and down without difficulty, and seemed pleasant and not distressed in any manner.  (Id.).  Plaintiff reported that he could lift 50 pounds at work, and could walk one-half of a mile.  (Tr. 170).  Plaintiff indicated that he has never required a cane, crutch, walker, or wheelchair for ambulation.  (Id.).  Dr. Sparkman noted that plaintiff had a past history of hepatitis C, which may have been caused by past intravenous drug use.  (Id.).  Plaintiff reported that he has been counseled to stay off alcohol and marijuana use for a six-month period so that he may be treated for his hepatitis.  (Id.).  Dr. Sparkman noted that plaintiff had undergone cervical fusion at C4-C5 and fusion of C5-C6 with

---

[14]Congenital cyst thought to originate from an obstruction of biliary ductules.  Stedman's at 447.

[15]The thickened, central portion of the fascia ensheathing the hand; it radiates toward the bases of the fingers from the tendon of the palmaris longus muscle.  Stedman's at 113.

[16]Excision of fascia of the palm of the hand.  See Stedman's at 649, 652.

anterior plating in 1996, surgical removal of the plate in his neck in 1996, a lumbarectomy in 1997, and lumbar fusion in 1998. (Id.). It was noted that plaintiff had a history of alcohol abuse, drinking six beers a day at least, and a thirty-year history of smoking one and one-half packages of cigarettes a day. (Tr. 171). Plaintiff reported experiencing headaches at least once a week. (Id.).

Upon physical examination, plaintiff's lateral flexion of the cervical spine was 40 degrees, forward flexion was 45 degrees, extension was 50 degrees, rotation bilaterally was 75 degrees, and no tenderness or muscle spasm was noted on palpation of the neck muscles.
(Tr. 172). Plaintiff's flexion-extension of the lumbar spine was 40 degrees and lateral flexion was normal. (Id.). Plaintiff had normal range of motion of the shoulders, elbows, wrists, hips, knees, and ankles. (Tr. 173). Plaintiff had near complete movement of the digits of the right hand and no compromise to the movement of the left hand. (Id.). Dr. Sparkman's impression was status post-operative, cervical and lumbar disc surgery; hepatitis C; reflux esophagitis; and status post-operative, excision of Dupuytren's nodules, right hand. (Id.). Dr. Sparkman stated that plaintiff's pain response was of a generalized nature, without any radiculopathy being described. (Id.). He stated that plaintiff was not noted to be experiencing any pain or swelling of the joints. (Tr. 174). Dr. Sparkman noted that plaintiff could perform the usual grip strength and fine finger movements, even with his post-operative right palm. (Id.). He stated that plaintiff had no significant impairment of motor or reflex function and showed no changes of muscular atrophy, spasm, or tenderness. (Id.). Dr. Sparkman noted that plaintiff demonstrated an ability to stand, walk, lift objects, carry objects, and handle objects in the office. (Id.).

A state agency medical consultant completed a Physical Residual Functional Capacity Assessment on April 9, 2003. (Tr. 177-85). The consultant expressed the opinion that plaintiff

could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push or pull an unlimited amount. (Tr. 178). The consultant found that plaintiff could frequently balance, but could only occasionally climb, stoop, kneel, crouch, and crawl. (Tr. 180). No manipulative, visual, communicative, or environmental limitations were found. (Tr. 181-82).

Plaintiff presented to Dr. Beyer on May 6, 2003, with complaints of low back pain. (Tr. 206). Plaintiff reported that the Oxycontin did not provide much relief. (Id.). An MRI was scheduled. (Id.).

Plaintiff underwent an MRI of the lumbar spine on May 13, 2003, which revealed post-operative changes at L5-S1, with granulation reaction on the left at L4-5 in the root sleeves; and spinal stenosis at L3-4 and L4-5. (Tr. 205).

Plaintiff saw neurologist Stephen D. Mellies on June 17, 2003, for evaluation of his low back pain. (Tr. 209). Upon physical examination, Dr. Mellies found no wasting of any muscle groups and no fasciculations.[17] (Tr. 210). No focal weakness to the lower extremities was found. (Id.). Plaintiff ambulated without difficulty and walked on his heels and toes. (Id.). Plaintiff could bend forward about 60 degrees from the upright position before he had to stop. (Id.). Dr. Mellies' impression was low back pain with some radiation into the hips, with some possible extension of pain into the very proximate portions of each leg, no signs of radiculopathy, no significant canal stenosis at any level, although possible foraminal stenosis bilaterally at L4-5; and

---

[17]Involuntary muscle contractions. See Stedman's at 650.

previous neck surgery on two occasions.  (Id.).  Dr. Mellies prescribed Relafen[18] and Flexeril, and recommended obtaining x-rays of the lumbar spine with oblique flexion and extension because of distortion of the MRI images due to the metal in plaintiff's back.  (Id.).

Plaintiff underwent x-rays of the lumbar spine on June 17, 2003, which revealed post-operative changes with effusion of the lower lumbar spine, and no acute changes.  (Tr. 211).

Plaintiff presented to Dr. Beyer on July 29, 2003, at which time plaintiff complained of worsening back pain.  (Tr. 203).  It was noted that plaintiff had seen a neurosurgeon, who found no suggestion of any surgical treatment.  (Id.).  Dr. Beyer continued plaintiff on Oxycodone, and recommended that plaintiff quit smoking.  (Id.).  On September 29, 2003, plaintiff complained of back pain in the cervical spine.  (Tr. 202).  Dr. Beyer prescribed ibuprofen.  (Id.).  On November 26, 2003, plaintiff reported feeling better since taking calcium and vitamin D.  (Tr. 201).  Plaintiff underwent bone density testing in December 4, 2003, which revealed plaintiff had normal bone density.  (Tr. 198).  On January 28, 2004, plaintiff complained of back pain and pain in his left ear.  (Tr. 196).  Plaintiff rated his pain as a 5 or 6 on a scale of 1 to 10 on average, with pain at a 9 or 10 with activity, and pain at a tolerable level of 2 to 3 after taking his Oxycontin.  (Id.).  Dr. Beyer recommended that plaintiff stay active and exercise, and be cautious about lifting.  (Id.).

Dr. Beyer completed a Physician Statement on July 20, 2004.  (Tr. 214).  Dr. Beyer expressed the opinion that plaintiff could frequently and occasionally lift less than ten pounds, could stand or walk at least two hours in an eight-hour workday, must periodically alternate between sitting and standing to relieve pain, and is limited in his ability to push or pull in his upper

---

[18]Relafen is indicated for acute and chronic treatment of signs and symptoms of osteoarthritis and rheumatoid arthritis.  See PDR at 1605.

extremities.  (Id.).


## The ALJ's Determination

The ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Act on August 18, 1999, the date the claimant stated he became unable to work, and continues to meet them through December 31, 2004.

2. The claimant has not engaged in substantial activity since the alleged onset date.

3. The claimant's impairments which are considered to be "severe" within the meaning of the Social Security Act and Regulations are: degenerative joint disease with fusion in the cervical and lumbar spine and hepatitis C.  He does not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 CFR 404, Subpart P, Appendix 1.

4. There is a medically determinable impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms.  The claimant's allegations are found **not** to be fully credible for the reasons set forth more fully above.

5. The claimant is able to lift and carry 20 pounds occasionally and 10 pounds frequently.  He is able to sit, stand, and/or walk for about six hours in an 8-hour day with normal breaks.  His ability to climb, stoop, kneel, crouch, and crawl is limited to an occasional basis and he should avoid climbing ladders, ropes, and scaffolds.  He has no other exertional or non-exertional limitations (20 CFR 404.1545 and 416.945).

6. The claimant is unable to perform his past relevant work as a factory assembler and landscaper.

7. The claimant was 40 years old, as of the alleged onset date and is now 45, which is defined as a younger individual (20 CFR 404.1563 and 416.963).

8. The claimant has a high school education (20 CFR 404.1564 and 416.964).

9. The claimant does not have any acquired work skills, which are transferable to the skilled or semiskilled work functions of other work (20 CFR 404.1568 and 416.968).

10. Based on an exertional capacity for light work and the claimant's age, education, and work experience, 20 CFR 404.1569, and 20 CFR 404 Subpart P, Appendix 2,

Rule 202.21, Table No. 2, would direct a conclusion of "not disabled."

11.     The claimant's capacity for the full range of light work has not been significantly compromised by additional nonexertional limitations. Accordingly, using the above-cited rule as a framework for decisionmaking, the claimant is not disabled.

12.     The claimant is not under a "disability," as defined in the Social Security Act (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 19-20).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the applications filed on December 17, 2002 (protective filing date), the claimant is not entitled to a period of disability or disability insurance benefits under sections 216(i) and 223, respectively, of the Social Security Act, and is not eligible for supplemental security income under sections 1602 and 1614(a)(3)(A) of the Act.

(Tr. 20).

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.      The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity"

determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document

entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. <u>See</u> 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. <u>See</u> 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. <u>See</u> 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. <u>See</u> 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. <u>See</u> <u>id.</u> Next, the Commissioner must determine the severity of the impairment based on those ratings. <u>See</u> 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. <u>See</u> 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the

Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.    Plaintiff's Claims on Appeal

Plaintiff raises two claims on appeal of the Commissioner's decision.  Plaintiff first argues that the ALJ erred in assessing plaintiff's residual functional capacity.  Plaintiff next argues that the ALJ erred in evaluating the credibility of plaintiff's subjective complaints.  The undersigned will address each claim in turn, beginning with the ALJ's credibility determination.

## 1.    Credibility Determination

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Defendant contends that the ALJ properly assessed plaintiff's credibility and discounted plaintiff's subjective complaints due to inconsistencies in the record.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies,

and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322.

Under Polaski, an ALJ must also consider a claimant's prior work record, observations by third parties and treating and examining doctors, and the claimant's appearance and demeanor at the hearing. 739 F.2d at 1322. In evaluating the evidence of nonexertional impairments, the ALJ is not free to ignore the testimony of the claimant "even if it is uncorroborated by objective medical evidence." Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996). It is well-established that in disability determinations, credibility assessments are left to the ALJ and not the courts. This court cannot "disturb the decision of an ALJ who seriously considers, but for good reasons explicitly discredits, a claimant's testimony of disabling pain." Browning v. Sullivan, 958 F.2d 817, 821-22 (8th Cir. 1992).

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when []he claims that [the pain] hurts so much that it prevents [him] from engaging in h[is] prior work." Benksin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent him from working are credible.

The ALJ first discussed the objective medical record. The ALJ noted that electromyography and nerve conduction studies were normal and without evidence of radiculopathy. (Tr. 116-17). He stated that MRIs revealed a narrow left neural foramen at C6-7 and narrowing at L2-3 and L4-5 without significant stenosis. (Tr. 118, 210). The ALJ noted that a neurological exam that plaintiff underwent in June 2003 showed fairly good range of motion of the cervical spine and revealed no evidence of weakness or wasting in the lower extremities. (Tr. 210). The ALJ pointed out that an earlier consultative exam failed to document a significant impairment of motor or reflex function. (Tr. 172-73). In addition, the ALJ noted that there was no evidence of muscular atrophy, spasm, tenderness, joint pain or swelling, and no compromise of gait or station. (Id.). The ALJ stated that there was no evidence of weight loss or diffuse atrophy or muscle wasting, which are common side effects of prolonged pain. The ALJ also pointed out that there are large gaps of time between visits to any health care professional, despite plaintiff's complaints of disabling pain. Failure to seek medical treatment may be inconsistent with a finding of disability and can be considered in assessing a claimant's credibility. See Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995); Stanfield v. Chater, 970 F. Supp. 1440, 1462-1463 (E.D. Mo. 1997). The ALJ thus concluded that the clinical and laboratory findings appear to be disproportionate to the severity of pain that plaintiff alleges.

The ALJ next discussed plaintiff's medications. He stated that there were periods of time when plaintiff was not taking any form of prescription drug or medication for relief of his alleged severe pain. The failure to request pain medication is inconsistent with subjective complaints of disabling pain. See Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003). Further, on January 28, 2004, plaintiff reported that the medication he was taking brought his pain down to a tolerable

- 22 -

level of a 2 to 3 on a scale of 1 to 10.  (Tr. 196).  Evidence of effective medication resulting in relief may diminish the credibility of a claimant's complaints.  See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999).

The ALJ then discussed plaintiff's testimony regarding his daily activities.  The ALJ noted that plaintiff testified that he is able to do light housekeeping chores, care for his two young children during the day, drive, run errands, and requires no assistance in dressing or personal grooming.  The ALJ pointed out that plaintiff told a physician that he had been deer hunting, which indicates that his pain is not as severe as alleged.  In addition, the ALJ noted that plaintiff testified that he was looking for work through January of 2003.  Significant daily activities may be inconsistent with claims of disabling pain.  See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).

An administrative opinion must establish that the ALJ considered the appropriate factors.  See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).  However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints.  See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).  In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not fully credible is supported by substantial evidence.

**2.      Residual Functional Capacity**

Plaintiff next argues that the ALJ erred in assessing plaintiff's residual functional capacity.  Specifically, plaintiff claims that the ALJ erred in rejecting the opinion of plaintiff's treating

physician, Dr. Beyer, and adopting the opinion of a non-physician.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogemeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 703.

Plaintiff first argues that the ALJ erred in rejecting the opinion of plaintiff's treating physician, Dr. Beyer. Dr. Beyer submitted a Physician Statement on July 20, 2004, in which he expressed the opinion that plaintiff could frequently and occasionally lift less than ten pounds, stand or walk at least two hours in an eight-hour workday, must periodically alternate between sitting and standing to relieve pain, and is limited in his ability to push or pull in his upper extremities. (Tr. 214). The ALJ noted Dr. Beyer's opinion and pointed out that Dr. Beyer provided no indication of how long plaintiff could sit. The ALJ then concluded:

> Dr. Beyer's opinion is not given controlling weight as it is not supported by or consistent with the objective medical evidence, particularly the neurologist who noted no weakness or wasting in the lower extremities, normal strength in the upper extremities, fairly good motion in the cervical spine, and forward bending to about 60 degrees (Exhibit 11F). It also appears to contradict his treatment recommendation that the claimant stay active, exercise, be cautious about body mechanics and lifting and is inconsistent with Dr.

Lange's, an orthopedic specialist, work release in August 1999 and recommendation to
gradually increase his activity level (Exhibit 9F).

(Tr. 18).

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the
various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir.
2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating
physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108,
1119 (E.D. Mo. 1999) (quoting Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995)). However,
such opinions do "not automatically control, since the record must be evaluated as a whole." Id.
at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be
discounted or disregarded where other "medical assessments 'are supported by better or more
thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).
An ALJ is free to reject the conclusions of any medical source if those findings are inconsistent
with the record as a whole. See Johnson, 240 F.3d at 1148. Such opinions may also be
discounted when a treating physician renders inconsistent opinions. See Prosch, 201 F.3d at
1013.

Here, the ALJ correctly assigned little weight to Dr. Beyer's opinion because it was
inconsistent with the record as a whole, including Dr. Beyer's own treatment notes. Dr. Beyer
treated plaintiff for a variety of complaints, including lower back pain, from May 2002 to
February 2003. (Tr. 147-62). Treatment notes reveal that Dr. Beyer prescribed medication but
did not conduct any objective testing during this time. On November 26, 2003, plaintiff reported
feeling better since taking calcium and vitamin D. (Tr. 201). On January 28, 2004, plaintiff
indicated that his pain medication brought his pain down to a tolerable level. (Tr. 196). Dr.

Beyer recommended that plaintiff stay active and exercise. (Id.). He did not impose any restrictions on plaintiff. As such, Dr. Beyer's treatment notes do not support Dr. Beyer's opinion that plaintiff is greatly restricted in his ability to work.

Dr. Beyer's opinion is also inconsistent with the remainder of the objective medical record. Dr. Lange, plaintiff's treating orthopedist, released plaintiff to full-duty work on August 17, 1999, after no evidence of radiculopathy was found. (Tr. 116). Dr. Lange indicated that plaintiff had no functional deficit but, rather, only experienced discomfort. (Id.). Dr. Sparkman, a consultative examiner, noted on April 1, 2003 that plaintiff demonstrated no ill effect from travel, ambulated rapidly without any obvious defect, and did not seem distressed in any manner. (Tr. 169). Plaintiff reported that he could lift 50 pounds at work, and that he could walk one-half of a mile. (Tr. 170). Dr. Sparkman found no changes of muscular atrophy, spasm, or tenderness, and noted that plaintiff demonstrated an ability to stand, walk, lift objects, carry objects, and handle objects. (Tr. 174). Dr. Mellies, plaintiff's neurologist, found no wasting of any muscle groups, no focal weakness to the lower extremities, no signs of radiculopathy, and no significant canal stenosis at any level. (Tr. 210). Dr. Mellies noted that plaintiff ambulated without difficulty and walked on his heels and toes. (Id.). This objective medical evidence does not lend support to Dr. Beyer's restrictive assessment. Thus, the ALJ properly assigned little weight to Dr. Beyer's opinion.

After discussing the objective medical evidence and plaintiff's own statements regarding his impairments, the ALJ concluded:

> [b]ased on a review of the entire record, the undersigned finds that the claimant is able to lift and carry 20 pounds occasionally and 10 pounds frequently. He is able to sit, stand, and/or walk for about six hours in an 8-hour day with normal breaks. His ability to climb, stoop, kneel, crouch, and crawl is limited to an occasional basis and he should avoid

climbing ladders, ropes, and scaffolds. He has no other exertional or non-exertional limitations.

(Tr. 18).

Plaintiff argues that the ALJ erred in relying solely on the opinion of the non-physician state agency medical consultant. The ALJ indicated that he was giving substantial weight to this assessment, as it was supported by the record as a whole. It has been held to be error for an ALJ to give more weight to non-medical evidence than to medical evidence. See Jeffcoat v. Bowen, 840 F.2d 592, 596 (8th Cir. 1988). However, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704 (emphasis added). Here, the ALJ determined that the medical consultant's opinion was consistent with the objective medical evidence. The ALJ relied heavily on the treatment notes of Dr. Lange, a treating orthopedic specialist, who released plaintiff to work in August of 1999, along with the opinion of plaintiff's neurologist, Dr. Mellies. As such, the ALJ did not err in adopting the opinion of the medical consultant, after finding it was supported by the objective medical record.

The ALJ's residual functional capacity determination is supported by substantial evidence in the record as a whole. The ALJ performed a proper credibility analysis and determined that plaintiff's subjective allegations were not entirely credible. Plaintiff's testimony that he engages in significant daily activities, can walk a half-mile, had recently gone deer hunting, and was looking for work through January of 2003, is supportive of an ability to perform light work. In light of the evidence in the record, including the objective medical record and plaintiff's own testimony, there is substantial evidence in the record as a whole to support the ALJ's determination that plaintiff retains the residual functional capacity to perform light work.

## **Conclusion**

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this  _19th_  day of September, 2006.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE